Filed 4/14/25  P. v. Farley CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CRAIG FARLEY,<br><br>    Defendant and Appellant. | D083515<br><br><br>(Super. Ct. No. SCD229026) |


APPEAL from an order of the Superior Court of San Diego County, Michael T. Smyth, Judge.  Affirmed.

Jeanine G. Strong, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

In 2010, Craig Farley and Pierre Terry went to the home of Jonathan Pleasant, a marijuana dealer Farley knew.  Neighbors heard wrestling

sounds and yelling followed by a loud boom from Pleasant's apartment, saw Farley and Terry run out, and ran in to discover Pleasant with a fatal shotgun wound. A jury convicted Farley of, among other counts, first degree murder (Pen. Code, § 187, subd. (a); count 1) committed while engaged in a robbery and a burglary (§ 190.2(a)(17)) for the benefit of a criminal street gang (§ 186.22(b)(1)). The jury further found Farley committed the offenses while acting as a principal, although it found *not* true allegations Farley personally used a firearm (§§ 12022.53(b), (c) & (d), 12022.5(a)). Farley then admitted a strike prior. The court sentenced him to life in prison without the possibility of parole, plus a consecutive determinate sentence of 25 years to life, on count 1, and stayed the sentences on the remaining counts. On direct appeal, we affirmed the judgment. (*People v. Farley* (Nov. 14, 2014, D062857) [nonpub. opn.].)

In 2020, Farley filed a form petition for resentencing under now section 1172.6 (formerly section 1170.95). Counsel filed a second petition in 2021. Following an evidentiary hearing, the resentencing court ruled Farley could still be found liable for felony murder and second degree implied malice murder but not for first degree express malice murder.

Farley appeals, arguing the record does not contain sufficient evidence to support the court's finding that the prosecution met its burden of proving him guilty of felony murder and second degree implied malice murder beyond a reasonable doubt. Considering the relevant factors set forth in *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522, we disagree and affirm the order as to felony murder. As a result, we need not reach Farley's alternate argument.

2

## I.

### A.

Pleasant sold marijuana from his apartment. He usually had four to five big bags of marijuana in his backpack or a safe. Pleasant sometimes had large amounts of cash, which he would put in his wallet, in a safe, or on a closet shelf. He would take large amounts of money out and count it or make change in front of friends, neighbors, and customers.

Pleasant also had a handgun he generally kept near him when selling marijuana.

### B.

On June 28, 2010, Pleasant spent the evening at home with his girlfriend. At one point, someone called him and came over. According to Pleasant's girlfriend, once the visitor arrived, Pleasant looked outside and unlocked the metal security door without hesitation to allow Farley to enter. Her impression was that Pleasant and Farley had a friendly relationship and had known each other for a while. A neighbor recalled seeing Farley in the apartment complex four or five times before.

Pleasant showed Farley more than one bag of marijuana and told him the price. Farley checked his pockets and shoes, said "hold on," and left. Before long, he returned and said he had left his money at home. They talked and smoked marijuana before Farley left.

### C.

The next morning, Pleasant's neighbor Mark visited Pleasant. Mark described the apartment as "clean." Someone called, and Mark heard Pleasant say, "hurry up and come."

Before his girlfriend left, Pleasant told her he planned to wait for his friend Corey as well as Farley, who was going to return.

When Corey arrived, Mark decided to leave, and Pleasant locked the security door behind him and closed the interior wooden door. Corey made a purchase and headed for the door. As Pleasant opened the wooden door, Corey heard him say, "I was waiting for you" to two men standing outside the security door.

As the first man stepped in, he said, "This is my brother and he's cool," pointing to the man behind him. Corey described them both as Black and described the man in front as being about six feet tall and wearing black name-brand athletic shoes. At trial, the prosecutor showed Corey a photograph of Farley's shoes, and Corey said they were similar in color, brand, and style to the ones he saw on the first man to enter Pleasant's apartment. The man had a backpack strapped to his chest, which he reached into as he came in. Corey did not look at the second man other than to notice he had lighter skin. He said they walked past him into the room, and he left.

Not long after, a neighbor heard wrestling sounds, yelling, and "a lot of banging" coming from Pleasant's apartment followed by "a loud boom." She waited "a few minutes" and then walked to her screen door, at which point she heard Pleasant yelling "help" and saw two men run by her and down the stairs. She said one wore a baseball hat and one carried a backpack. She estimated their heights at about 5'6" or 5'7".

Another neighbor also heard wrestling followed by a gunshot. After looking out the door and then notifying her sister in the other room, she and her sister ran to Pleasant's apartment, which she described as "trashed."

Mark's sister, who was in her car in the alley outside, called him and said she had seen two men run out of the apartment and thought someone had been robbed. She later told police the first male who came down the

4

stairs had a backpack strapped to his front, gloves, and darker skin. She estimated them as 5'7" or 5'9" in height.

Mark rushed out of his apartment, saw Pleasant's door was open, and ran inside to find Pleasant slumped over with two neighbors providing first aid. Pleasant screamed, "Oh, God, they shot me." Mark used a towel to put pressure on the gunshot wound until a police officer took over. Pleasant was pronounced dead at the scene.

### D.

Medical examiners explained Pleasant's wound indicated he had been shot with a shotgun at close range and died from the resulting blood loss. Pleasant also had a laceration on his head consistent with being struck with a hand- or shotgun that caused a subarachnoid hemorrhage.

A responding officer observed Pleasant's apartment looked like a struggle or fight had occurred based on the overturned furniture. Officers found handcuffs, the slide of a semi-automatic handgun, and Pleasant's open and empty safe. Investigators also located a black baseball hat containing Terry's DNA. DNA evidence taken from the gun slide and Pleasant's fingernail scrapings also matched Terry, and his fingerprints were found on artwork in the living room. Farley's DNA was on a roll of duct tape.

Cell phone records placed Farley near the crime scene and demonstrated he was in communication with Terry before and after Pleasant's killing. Calls were made from Farley's cell phone to Pleasant's cell phone the evening of June 28. That same night, nine calls were placed from Farley's phone to Terry's. The first call from Farley's phone to Terry's phone originated from a cell phone tower on Pleasant's apartment building.

The next morning, Farley called Terry and then exchanged several calls with Pleasant. After the incident with Pleasant, Farley and Terry exchanged

5

numerous text messages. Shortly after, a request was made to Farley's cell phone provider for a new phone number. Cell phone records for the new number showed Farley leaving California the next morning and traveling to Louisiana.

Louisiana deputies detained Farley. He was then transported back to San Diego.

A laptop computer found in Farley's Louisiana hotel room revealed internet searches for "El Cajon Boulevard shooting" and related topics, searches on the San Diego County Sheriff's website for arrest warrants for himself, and a search of "who's in jail" for Terry.

II.

On appeal, Farley contends the record does not contain sufficient evidence to support the court's finding that he could still, under the amended murder statutes, be found guilty of felony murder and second degree implied malice murder. We disagree.

A.

Senate Bill 1437 was enacted to "'ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)" (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723.) It implemented this goal by amending section 188, which defines malice, and section 189, which defines the degrees of murder. (Stats. 2018, ch. 1015, §§ 2 & 3.)

Under the new legislation, a petitioner who makes a prima facie showing he or she could not presently be convicted of murder under the amendments to the murder laws is entitled to an evidentiary hearing. (§ 1172.6(c), (d)(1).) At the hearing, the prosecution bears the burden "to

6

prove, beyond a reasonable doubt, that the petitioner is guilty of murder" under the amended laws.  (§ 1172.6(d)(3).)  "[T]he superior court acts as an independent fact finder and determines whether the People have met their burden in proving the defendant guilty of murder."  (*People v. Henley* (2022) 85 Cal.App.5th 1003, 1016.)  "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated."  (§ 1172.6(d)(3).)

B.

To demonstrate that a nonkiller was a major participant in the underlying felony who acted with reckless disregard for human life, the prosecution must show that the defendant "knowingly engaged in criminal activities known to carry a grave risk of death."  (*Banks*, 61 Cal.4th at p. 801 [cleaned up].)  "The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create."  (*Ibid.*)  But, "participation in an armed robbery, without more, does not involve engaging in criminal activities known to carry a grave risk of death."  (*Id.* at p. 805 [cleaned up].)

*Banks* compiled the following list of factors to be considered in determining whether a participant's role should be considered "major":

(1) The defendant's role in planning the crime that led to one or more deaths;

(2) The defendant's role in supplying or using lethal weapons;

(3) The defendant's awareness of "particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants";

7

(4) Whether the defendant was present at the scene of the killing and in a position to facilitate or prevent the murder; and,

(5) The defendant's actions after lethal force was used.

(*Banks,* 61 Cal.4th at p. 803.)  No one factor is necessary or alone sufficient. (*Ibid.*)

Because there was no evidence the defendant in *Banks*—the getaway driver in an armed robbery that resulted in a shooting death—saw or heard the shooting or could have prevented it, the court determined he was not a major participant.  (*Banks*, 61 Cal.4th at p. 805.)  Likewise, because the direct perpetrator's killing of a security guard "was apparently a spontaneous response to armed resistance from the victim," there was no evidence he knew his own actions would involve a grave risk of death.  (*Id.* at p. 807.) Accordingly, the court concluded the defendant was not recklessly indifferent to human life.  (*Ibid.*)

The next year, our high court returned to this issue, endorsed the *Banks* factors, and sought to further define "reckless indifference to human life."  (*Clark,* 63 Cal.4th at p. 611.)  To assess whether a defendant exhibited reckless indifference, the court offered the following factors:

(1) the defendant's "knowledge of weapons, and use and number of weapons";

(2) the defendant's "physical presence at the crime and opportunities to restrain the crime and/or aid the victim";

(3) the "duration of the felony";

(4) the "defendant's knowledge of cohort's likelihood of killing"; and

(5) the "defendant's efforts to minimize the risks of the violence during the felony."

8

(*Clark*, 63 Cal.4th at pp. 618-621, capitalization omitted.)  The requirements of being a major participant and having reckless indifference to human life "'significantly overlap . . . , for the greater the defendant's participation in the felony murder, the more likely [the defendant] acted with reckless indifference to human life.'"  (*Id.* at pp. 614-615.)

C.

We review for substantial evidence the trial court's factual findings at a section 1172.6 evidentiary hearing.  (*Henley*, 85 Cal.App.5th at p. 1017.)  Under this lens, we review the record in the light most favorable to the judgment to decide if the prosecution introduced sufficient evidence— reasonable, credible evidence of solid value—to support a finding of guilt beyond a reasonable doubt.  (*Ibid.*)  We will affirm unless sufficient substantial evidence would not support the verdict under any hypothesis.  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  We must accept any logical inferences the trier of fact might have drawn from the circumstantial evidence.  (*Ibid.*)

D.

Here, the court issued a written decision in which, as relevant, it found beyond a reasonable doubt Farley (1) was a major participant in the underlying felonies of robbery and burglary of an inhabited dwelling who (2) acted with reckless indifference to human life.  Accordingly, it concluded he was guilty of felony murder under amended law.

1.

Substantial evidence supports the court's conclusion Farley was a major participant in the underlying felonies.

First, as to Farley's role in planning, the court concluded it was "significant, likely the most significant, role in planning the robbery."  Farley

9

counters this conclusion is speculation. We conclude, however, it was reasonable for the court to infer Farley played a major role in the planning.

"An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." (Evid. Code, § 600(b).) A reasonable inference may not be based on speculation, conjecture, or guess work. (*People v. Davis* (2013) 57 Cal.4th 353, 360.) An appellate court must accept logical inferences drawn from the circumstantial evidence. (See *People v. Maury* (2003) 30 Cal.4th 342, 396.)

There is no evidence Terry knew Pleasant or that he was a marijuana dealer. Farley, on the other hand, had visited Pleasant before. Pleasant's girlfriend testified that when Farley came over the night before the murder, Pleasant recognized him, immediately unlocked the door, and smoked marijuana with him.

Several witnesses testified no other buyer had ever come without money before; thus, it was logical for the court to infer Farley's nighttime visit was a ruse to gather information. This inference is supported by the cell phone records, which show Farley called Terry repeatedly during and after his visit with Pleasant the night before the murder.

Due to the nighttime visit, Farley learned what marijuana Pleasant had in the apartment. After leaving the apartment and before returning the next morning, Farley called Terry, which could justifiably support the inference he called to discuss the plan. Although Farley argues he had no need to "case" the place because he already knew Pleasant was a dealer who likely had marijuana and cash, that he went late in the evening and returned the next morning supports the inference he was investigating Pleasant's current supply.

10

Farley also arranged the meeting with Pleasant the next day and vouched for Terry. He then entered the apartment with a backpack likely containing the murder weapon, tape, and handcuffs. From these facts, the court could logically deduce Farley had a significant role in planning the robbery. Given the totality of these circumstances, the court appropriately found this factor weighed in favor of finding Farley was a major participant.

Second, as to his role in supplying or using lethal weapons, Farley argues the court's conclusion that he was carrying the handgun, and thus had a role in supplying weapons, was speculation and not substantial evidence. Notably, the court did not specify Farley carried the handgun. It found it reasonable to infer he carried one of the two weapons in his backpack. We agree.

Farley's fingerprints were not on the handgun slide left behind, and the jury determined he did not personally use a firearm. But Farley entered with a backpack strapped to his chest and Corey did not mention seeing either man with a shotgun, so it was reasonable for the court to infer Farley was aware of and carried the shotgun in his backpack. As the jury apparently concluded Terry was the shooter, the court could logically deduce Farley supplied Terry with the murder weapon. (See Evid. Code, § 600(b).) The absence of Farley's fingerprints on the handgun slide does not undermine this inference given the testimony about the suspect wearing the backpack and fitting Farley's description wearing gloves. Accordingly, this factor weighs in favor of a major participant finding.

Third, as to awareness of the dangers posed by the nature of the crime, Farley argues the fact he had duct tape and handcuffs suggests he did not intend violence but rather planned to restrain Pleasant. We find this argument untenable given Pleasant was over six feet tall and almost

11

300 pounds, whereas Farley and Terry were each smaller according to witness' estimates. Additionally, it was common knowledge Pleasant was armed, as Corey said Pleasant always had the handgun with him in his home—often on his lap or at his side. As Farley had been there previously, it was reasonable for the court to conclude he knew taking Pleasant's money and marijuana would present significant danger because any attempt to subdue Pleasant would have involved a significant struggle and the probable threat Pleasant would defend himself with his firearm.

As in *Clark*, where the participants brought a gun to compel store employees to submit to being handcuffed (*Clark,* 63 Cal.4th at p. 613), it is reasonable to infer Farley and Terry anticipated a struggle and brought firearms to facilitate restraining Pleasant. That at least one weapon was loaded further belies the inference Farley intended to subdue Pleasant with only tape and handcuffs. This factor thus favors concluding Farley was a major participant.

Fourth, as to presence at the scene and ability to facilitate or prevent the murder, the court correctly noted witness testimony from before and after the killing, Farley's DNA on the duct tape, and cell phone records place Farley at the scene of the murder. Nonetheless, because the sequence of events inside the apartment is unknown, the court recognized it could not say Farley could have physically stopped the shooting in the moments before it occurred. Farley agrees, pointing out that any effort he made to stop Terry from shooting Pleasant likely would have resulted in Farley getting shot. That may be true, but as the court pointed out, Farley could have preemptively thwarted the murder by not bringing firearms into the apartment or by ensuring they were unloaded. It also is reasonable to presume Pleasant was pistol-whipped prior to being shot. If Terry inflicted

12

the blow, as the jury seemingly found, this would have provided Farley insight into Terry's violent nature, at which point he could have intervened. Nonetheless, given the uncertainty, this factor is given neutral weight.

Fifth, as to Farley's actions after lethal force was used, the United States Supreme Court as well as our own high court have explained a defendant's actions after a fatal shooting may bear on the defendant's mental state. (See *Tison v. Arizona* (1987) 481 U.S. 137, 151-152 and *In re Scoggins* (2020) 9 Cal.5th 667, 679.) Farley contends his post-crime actions reveal little about his state of mind and, if anything, an aborted call he made to 911 hours later should weigh in his favor. We disagree.

Pleasant's neighbor testified the robbers did not flee immediately after the "boom." Although her time estimates varied, she said she was standing by her door when she heard the boom and then went to sit on her couch for "a few minutes" before returning to the door and observing the men run by. Using a stopwatch in court, the prosecutor asked the neighbor to estimate the time between the "boom" and seeing the fleeing men—the stopwatch reflected 26.6 seconds. Either way, there is no evidence Farley used the time to aid Pleasant or call 911. Rather, because he did not immediately leave the apartment, and given the evidence police did *not* find at the scene, it is reasonable to infer he used the time to hide the weapons and collect money and marijuana.

Besides, if Farley was shocked Terry shot Pleasant, he could have stayed to render aid while only Terry fled. Instead, he exchanged several text messages with Terry after Pleasant's killing, fled the state, and changed his phone number. On these facts, we find this factor tips the scale in favor of finding Farley was a major participant.

13

Weighing the factors, we conclude Farley's significant involvement in criminal activities known to carry a grave risk of death could appropriately be considered "major."  (*Banks,* 61 Cal.4th at p. 803.)

2.

In addition, substantial evidence supports the court's finding Farley acted with reckless indifference to human life.

First, as to knowledge and use of weapons, for the reasons already stated, it was reasonable to infer that Farley knew at the very least the shotgun would be used.  While our high court has repeatedly reiterated that "any person who plans or participates in an *armed* robbery can be said to anticipate that lethal violence might be used," this "fact, without more, does not establish reckless indifference to human life."  (*Scoggins*, 9 Cal.5th at p. 682.)  Yet Farley anticipating *any* use of a shotgun within the confines of a small apartment arguably constitutes the "more" required to elevate the situation to one involving a grave risk of death.  And Farley would also have become aware of the handgun, at the latest, when he observed Terry pistol-whipping Pleasant.  These facts weigh in favor of finding he acted with reckless indifference.

Second, as to presence at the scene and opportunity to restrain the killer or aid the victim, as previously discussed, evidence shows beyond a reasonable doubt Farley was present at the scene and could have aided Pleasant.  Whether he had an opportunity to restrain Terry before the shotgun blast is unclear, but testimony suggests a struggle lasted for several minutes during which time he may have had a chance to intervene.  This factor weighs slightly in favor of Farley having the requisite mental state.

Third, as to the felony's duration, evidence suggested the struggle in the apartment lasted for several minutes, and the court opined this was a

14

very long struggle during which Farley failed to stop Terry from killing Pleasant. As *Clark* explained, "[w]here a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' . . . , possibly culminating in murder." (*Clark*, 63 Cal.4th at p. 620.) We would not characterize the encounter here as prolonged. Even so, it persisted long enough for Pleasant to be struck in the head with a handgun and for furniture in two rooms to be upended. It was long enough for Farley to leave if he were appalled by the situation once it became violent. Instead, he stayed without interceding. This evidence shows some degree of reckless disregard for human life.

Fourth, as to Farley's knowledge of Terry's propensity to kill, the court found "no evidence" Farley knew of "earlier violence, lethal or otherwise" by Terry and concluded this factor did not weigh in favor of a reckless indifference finding. The People concede this point. Aside from the red flags raised once Pleasant was pistol-whipped, we agree this factor is not decisive.

Finally, Farley does not offer any evidence suggesting he attempted to minimize the risks, and in any event such evidence would not necessarily foreclose a reckless indifference finding. (See *Clark,* 63 Cal.4th at p. 622.)

Farley's contributions to the planning and execution of this crime were significant. Ultimately, viewing the record in the light most favorable to the court's denial of the resentencing petition as we must, and "after considering those aspects of the present felony that provide insight into both the magnitude of the objective risk of lethal violence and [the] defendant's subjective awareness of that risk" (*Clark,* 63 Cal.4th at p. 623), we conclude sufficient evidence supports finding Farley knowingly planned and engaged in criminal activities known to carry a grave risk of death.

15

Lastly, we address Farley's argument the court erred in failing to consider his youth—21 years old at the time of the offense—when ruling on his resentencing petition. The People did not respond to this argument. We discern no reversible error.

Following developments in psychology and brain science showing differences between juvenile and adult minds, California has begun legislating with these differences in mind, and "several appellate courts have addressed the relevance of a defendant's youth when conducting an analysis of major-participant and reckless-indifference findings." (*People v. Oliver* (2023) 90 Cal.App.5th 466, 485-486.) "The hallmark features of youth include immaturity, impetuosity, and failure to appreciate risks and consequences. The background and mental and emotional development of a youthful defendant must be duly considered in assessing his culpability. They are more vulnerable or susceptible to outside pressures than adults." (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 991 [cleaned up].)

Farley does not direct us to evidence in the record showing his counsel raised this issue below. Yet it is not certain forfeiture applies because the evidentiary hearing occurred in October 2023, and at least one appellate court determined as early as December 2022 that, "[i]n addition to the *Banks* and *Clark* factors, a defendant's youthful age *must* be considered." (*People v. Jones* (2022) 86 Cal.App.5th 1076, 1088, fn. 7, italics added.)

We need not decide this issue, though, because even if the court erred in not considering Farley's youth, the error was harmless. Appellate courts assessing prejudice in this area have applied the standard from *People v. Watson* (1956) 46 Cal.2d 818, 836, which asks whether it is reasonably probable a result more favorable to Farley would have been reached absent

16

the failure to consider his youth.  (E.g., *People v. Jimenez* (2024) 103 Cal.App.5th 994, 1007.)

"[T]he case law discussing the differences in brain development among youthful offenders (in contrast to their adult counterparts) stress two areas of divergence: (1) their relative impulsivity; and (2) their vulnerability to peer pressure." (*Oliver,* 90 Cal.App.5th at p. 489.)  Farley does not point us to any evidence in the record suggesting his criminal behavior was motivated by either factor.  Given the evidence Farley visited Pleasant the night before to gather information about Pleasant's stash of drugs and cash, spoke with Terry repeatedly by phone, and likely concealed a shotgun in his backpack before returning with Terry the next morning, this incident does not appear to be an impulsive crime.  The record also contains no evidence indicating Farley looked up to Terry, who was younger than him, or otherwise felt peer pressure to participate in the crimes.  We further note Farley has not identified any evidence regarding his upbringing or maturity level to support finding lesser culpability for murder.  (Cf. *Jones*, 86 Cal.App.5th at pp. 1091, 1093 [remanding for consideration of youth where defendant offered report asserting he had traumatic and violent upbringing, had mental health issues, abused drugs, and was numbed to violence].)

It does not seem reasonably probable the court would have reached a result more favorable to Farley had it considered his youth.  We thus conclude any error was harmless.  Given our conclusion, it is unnecessary to address the trial court's additional finding that Farley could be found guilty of aiding and abetting an implied malice murder.

17

### III.

We affirm.

CASTILLO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

RUBIN, J.